Hart L. Robinovitch (AZ #020910)
Ryan J. Ellersick (AZ #038805)
ZIMMERMAN REED LLP
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Renay Kristapher, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Raley's Arizona LLC d/b/a Bashas',<br><br>Defendant. | No. CV-24-02037-PHX-KML<br><br>**PLAINTIFF'S RESPONSE TO RALEY'S ARIZONA LLC'S MOTION TO DISMISS CLASS ACTION COMPLAINT** |

## INTRODUCTION

Arizona law provides strong privacy protections against data brokers and corporations harvesting the "communication service records" of Arizona residents without consent. That law, known as the Telephone, Utility, and Communication Service Records Act ("TUCSRA"), defines a "communication service record" to include email "access logs," which are digital logs containing information about when and how a person opens and reviews emails from outside senders. To enforce the protections under TUCSRA, the Arizona legislature created a private right of action and imposed minimum statutory damages of $1,000 per violation.

This case involves an Arizona resident who signed up to receive marketing emails from Defendant Raley's Arizona LLC ("Raley's"), which operates the Bashas' grocery chain in Arizona. Unbeknownst to Plaintiff, Raley's embedded third-party tracking code technology in its marketing emails called a "pixel," which secretly extracted "access logs" associated with every email opened by Plaintiff. The "access logs" then obtained by Raley's revealed details about when Plaintiff opened the emails, how often, what device she used, whether she forwarded the email to others, and Plaintiff's general location each time she opened an email—allowing Raley's to compile a digital dossier of Plaintiff's private email habits.

Plaintiff filed her complaint in Arizona state court, asserting a single count under TUCSRA on behalf of an Arizona class seeking statutory damages. Raley's then removed the case, arguing that this Court had jurisdiction to adjudicate Plaintiff's state law claim. After securing the venue of its choice, Raley's abandoned its position and now argues the case must be dismissed for lack of federal subject matter jurisdiction because Plaintiff suffered no injury sufficient to confer Article III standing. But if Plaintiff lacked Article III standing, as Raley's now argues, then Raley's had no good faith basis to remove the case from state court in the first place. The proper remedy, therefore, is to remand the case to state court where it began, not dismiss the case with prejudice as Raley's seeks. Further, because Raley's had no objectively reasonable basis for removing the case in the first instance—which has caused unnecessary delay and wasted judicial and party resources—Plaintiff is entitled to reasonable attorneys' fees for the time required to respond to Raley's motion.

If the Court decides to reach the merits of Raley's motion to dismiss under 12(b)(6), that motion should be denied. Plaintiff's claim falls squarely within TUCSRA's statutory protections, which prohibits entities like Raley's from harvesting the email access logs of Arizona residents without consent.

## FACTUAL BACKGROUND

In an increasing digital world, online tracking by corporations and advertisers has become ubiquitous. Compl. ¶ 2. Consumer data is the currency of the new digital economy, and companies use a variety of tactics to accumulate individual data points on consumer behavior, which can then be aggregated and monetized. *Id.* ¶¶ 2-3. Grocery chains and retailers like Raley's are at the forefront of this data market and the associated efforts to harvest consumer data. *Id.* ¶ 4. As privacy concerns over online tracking have increased, companies have looked to additional methods for gathering consumer data in addition to traditional web tracking. *Id.* ¶ 5-6.

One of those methods is direct email. *Id.* ¶ 6. Email provides an effective vector for gathering consumer data because people generally keep the same email address over time, making it easier to identify consumers over the long term. *Id.* ¶ 7. A person's email habits can also be linked to their online browsing activity, providing a more comprehensive picture of a consumer's online and offline behavior. *Id.* Such data can then be monetized. *Id.* ¶ 2-3.

But tracking a consumer's email habits requires more than just sending a marketing email. To gain more detailed insights into consumer behavior, many companies deploy what are called email tracking "pixels," which is an embedded code that gathers various data points about when and how a consumer accesses an email. *Id.* ¶¶ 19-21. Specifically, email tracking pixels tell the company when a consumer accesses an email, how often they review the email, what device the consumer is using (laptop, desktop, tablet), whether the email is forwarded, and the consumer's general location each time they access the email. *Id*. This "access log" information is stored on server logs for further review and analysis by the company sending the email. *Id.* ¶ 22. Because the "pixel" is invisible to the naked eye, the only way a consumer

would know about this practice is if the company discloses it, which many companies do explicitly in their privacy policies. *Id.* ¶¶ 23, 27. Raley's does not. *Id.* ¶ 45.

Extracting a consumer's email "access logs" without advance consent raises serious privacy concerns. While a person who signs up for marketing emails expects to receive promotional emails about discounts or special offers, they do not expect the company that sent the email to secretly monitor when and how they access the email. *Id.* ¶ 18. A recent study by researchers at Northwestern University and the University of Delaware analyzing the privacy implications of email tracking pixels found that a hypothetical consumer who reviewed an email 8 times over a 12-hour period would reveal (1) the likely location of her place of work, (2) that "she usually reads email on her iPhone," (3) that she goes to a nearby city . . . to spend Friday evening," (4) that she returns back to her [city of residence] very late," and (5) that she "goes to sleep after midnight." *Id.* ¶ 30. Researchers at Princeton also found that email tracking pixels can provide a gateway for multiple third-party companies to link a consumer's web traffic with the consumer's email address, effectively creating a digital dossier of consumer behavior. *Id.* ¶¶ 31-32.

Raley's deploys tracking pixels in its marketing emails, and relies on a third-party email service provider, Ideas Made Measurable, to transmit its emails and log the recipient's access information. *Id.* ¶¶ 22, 39-40. Raley's does not disclose its use of email tracking pixels to consumers. *Id.* ¶ 45.

Like many Arizona residents, Plaintiff Renay Kristapher signed up to receive promotional emails from Raley's, which she receives on a regular basis. Compl. ¶ 41. In or about February 2024, Plaintiff opened one of Raley's marketing emails that contained a tracking pixel, which caused the access logs about when, how, and where the email was opened to be transmitted to Raley's and third-party email provider Ideas Made Measurable for further analysis and review. *Id.* ¶ 43. Because Plaintiff was unaware of the existence of the tracking pixel, she did not consent to Raley's and third parties obtaining the access logs. *Id.* ¶ 46. When Plaintiff learned about this practice and the protections afforded by TUCSRA, she filed a complaint on behalf of herself and other Arizona residents whose "communication

service records" were unlawfully obtained by Raley's, seeking statutory damages available under the statute and to enjoin Defendant from continuing its unlawful practice. *Id.* ¶¶ 10, 47.

## ARGUMENT

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a claim for lack of subject-matter jurisdiction. Federal courts are courts of limited jurisdiction and may only hear cases as authorized by the Constitution or statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). For there to be a case or controversy under Article III, the plaintiff must have "standing," meaning (i) the plaintiff suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) the injury was likely caused by the defendant; and (iii) the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). In the typical case, it is a plaintiff's burden to prove jurisdiction exists. *Kokkonen*, 511 U.S. at 377. But when a defendant removes a case to federal court and invokes federal jurisdiction, the burden to prove subject matter jurisdiction rests with the defendant. *Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023)

A successful motion to dismiss under Rule 12(b)(6) must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss as long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### I. THE COURT SHOULD REMAND THIS CASE TO STATE COURT AND ORDER RALEY'S TO PAY ATTORNEYS' FEES

When a defendant removes a case to federal court, the defendant has the burden to establish the plaintiff's Article III standing. *Jones*, 85 F.4th at 573 ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction."); *Smelt v. Cnty. of Orange*, 447 F.3d 673, 632 (9th Cir. 2006) ("The burden of

showing that there is standing rests on the shoulders of the party asserting it."); *Garcia v. Kahala Brands, LTD.*, No. CV 19-10062-GW-JEMX, 2020 WL 256518, at *1 (C.D. Cal. Jan. 16, 2020) (observing that removing defendants, "as the party asserting federal jurisdiction, bear the burden of establishing [a plaintiff's] Article III standing"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the elements of standing].").

If a removing defendant abandons its burden to show Article III standing, the proper remedy is to remand the case to state court under 28 U.S.C. § 1447(c). *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 n.6 (9th Cir. 2018) ("As a general rule, if the district court is confronted with an Article III standing problem in a removed case—whether the claims at issue are state or federal—the proper course is to remand for adjudication in state court."); *Parrish v. Everi Payments Inc.*, No. 222CV00511GMNDJA, 2023 WL 3276400, at *2 (D. Nev. May 4, 2023) ("Defendants removed this action to federal court only to move to dismiss for lack of standing. Because Defendants cannot or will not bear their burden of demonstrating that this Court has jurisdiction over this case, the Court must remand the case to state court."). Section 1447(c) is clear that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." (emphasis added). "Remand is the correct remedy because a failure of federal subject-matter jurisdiction means only that the federal courts have no power to adjudicate the matter[, but] State courts are not bound by the constraints of Article III." *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016). Section 1447(c) mandates remand to state court even when the defendant removed the case under the Class Action Fairness Act. *Id.*

Because Raley's has abandoned its burden of showing Article III standing (and actually now represents the opposite of its removal papers[1]), this Court should remand the case to state

[1] *Compare* Def. Mot. to Dismiss at 2, 5 ("Plaintiff's allegations of privacy-based harms does not rise to the level of a sufficient injury under Article III of the United States Constitution, and she therefore lacks standing to bring this claim." … "Plaintiff has alleged no such concrete injury."), *with* Def. Not. of Removal at ¶ 15 ("According to the Complaint, Plaintiff seeks 'statutory damages in an amount of $1,000 per violation,' among other forms of relief.").

court. Plaintiff, an Arizona resident, elected to file her complaint in Arizona state court, asserting a single claim under an Arizona statute, on behalf of an Arizona class.

Federal courts are courts of limited jurisdiction, whereas state courts are courts of general jurisdiction. The type of injury required for Article III standing is not necessary to proceed in state court. *See Lee v. American Nat'l Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001) ("[A] plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury."). In state court, Plaintiff (and the putative class members) can proceed to seek statutory remedies based on the statutory injuries provided to them by the Arizona legislature. *See Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 523 ¶ 12 (2021) ("Standing may be conferred by a statute."). For this reason, subsequent to the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), numerous privacy law cases seeking statutory damages proceed in state court and are not dismissed for lack of the type of injuries required for Article III standing. For instance, in *Khan v. Children's National Health System*, 188 F.Supp.3d 524, 534-35 (D. Md. 2016), the court held:

> The plain language of § 1447(c) gives 'no discretion to dismiss rather than remand an action' removed from state court over which the court lacks subject-matter jurisdiction. The Court declines CNHS's invitation to ignore the plain language of the statute and dismiss the case. This case will be remanded to state court.
>
> The Court finds that Khan lacks standing, but it does not dismiss her claims. Instead, the case is REMANDED to state court.

(internal citations omitted); s*ee also Smith v. The Ohio State University*, 191 F.Supp.3d 750, 757 (S.D. Ohio 2016) ("Without a concrete and particularized injury-in-fact, there is no Article III standing in this Court. Because the Plaintiffs do not have standing in this Court, the Court lacks subject-matter jurisdiction and must remand the case back to the Ohio Court of Claims for further adjudication.").

For unknown reasons, Raley's removed the case and invoked this Court's jurisdiction. But after securing the venue of its choice, Raley's "immediately disavow[ed] federal jurisdiction, apparently in hopes of achieving outright dismissal, with prejudice, rather than

the remand required by § 1447(c).” *Mocek v. Allsaints USA Ltd.*, 220 F. Supp. 3d 910, 914 (N.D. Ill. 2016). Given the lack of jurisdiction, this Court should remand the case to state court where it began.

Raley’s unnecessary procedural maneuver also entitles Plaintiff to her attorneys’ fees in responding to Raley’s motion. Section 1447(c) provides that “[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.” “Absent unusual circumstances, courts may award attorney’s fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.” *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). “Relevant to the objective reasonableness inquiry are the clarity of the applicable law and whether such law clearly foreclosed the arguments in support of removal.” *Pioneers Mem’l Healthcare Dist. v. Imperial Valley Healthcare Dist.*, No. 24-CV-861 JLS (LR), 2024 WL 3858135, at *13 (S.D. Cal. Aug. 19, 2024) (cleaned up). Requiring the defendant to pay attorneys’ fees is an appropriate deterrent for improper removals because “[t]he process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources.” *Id.* at 140; *see also Collier v. SP Plus Corp.*, 889 F.3d 894, 897 (7th Cir. 2018) (denying award for attorneys’ fees based on lack of briefing on issue but noting that defendant’s “dubious strategy” of removing the case and immediately moving to dismiss for lack of jurisdiction “resulted in a significant waste of federal judicial resources, much of which was avoidable”).

Raley’s own motion demonstrates it had no “objectively reasonable basis” for invoking this Court’s Article III jurisdiction. Raley’s devotes the majority of its motion to outlining the various reasons why this Court lacks jurisdiction. Indeed, the primary case Raley’s relies on to undermine Plaintiff’s Article III standing, *Hartley v. Urban Outfitters, Inc.*, No. CV 23-4891, 2024 WL 3445004, at *7 (E.D. Pa. July 17, 2024), was decided on July 17, 2024, weeks before Raley’s removed this case. Raley’s also provides a lengthy string citation in support of its argument that “courts have rejected similar purported harms as insufficient to establish Article III injury.” Def. Mot. to Dismiss at 7. Given the “clarity of the applicable law and [the

fact that] such law clearly foreclosed the arguments in support of removal," *Pioneers Mem'l*, 2024 WL 3858135, at *13, Raley's removal lacked an "objectively reasonable basis." Under similar circumstances, where defendants have removed a case and immediately argued for dismissal based on a lack of standing, courts routinely award attorneys' fees. *See, e.g., Pioneers Mem'l*, 2024 WL 3858135, *13-14 (collecting cases where fees were awarded and noting the court's inclination to grant attorney's fees upon submission of supporting documentation).

Accordingly, Plaintiff respectfully requests that the Court remand this case to state court and award Plaintiff attorneys' fees in an amount to be determined at a later date.[2]

## II. PLAINTIFF PROPERLY STATES A CLAIM UNDER TUCSRA

Because Raley's has the burden of establishing this Court's jurisdiction but has declined to carry that burden, the Court need not reach the merits of Raley's motion to dismiss under 12(b)(6). But if the Court does address the merits, it should find that Plaintiff has adequately stated a claim for relief under a plain application of TUCSRA.

The goal in statutory interpretation is "to effectuate the legislature's intent as expressed in the statute's text." *Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 559 ¶ 22 (2018) (cleaned up). Unless there is ambiguity in a provision's meaning, or a provision's plain meaning would produce absurd results, a court's "inquiry begins and ends with the plain meaning of the legislature's chosen words, read within the 'overall statutory context.'" *Welch*, 251 Ariz. at 523 ¶ 11 (quoting *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, 28 ¶ 13 (2020)); *see also Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017) ("Words in statutes should be read in context in determining their meaning.").[3]

---

[2] If the Court grants Plaintiff's request for attorneys' fees, Plaintiff's counsel will file a declaration and supporting records reflecting counsel's hourly rates and hours reasonably expended in responding to Raley's motion. *Cf. Welch v. Air & Liquid Sys. Corp.*, No. C21-904 MJP, 2021 WL 3486720, at *3 (W.D. Wash. Aug. 9, 2021) (remanding case to state court but retaining jurisdiction on issue of fees and ordering plaintiffs "to submit a declaration(s) and supporting records sufficient to show counsel's hourly rates, the hours reasonably expended, and the costs incurred in obtaining remand of this matter").

[3] Raley's begins its analysis of TUCSRA by pointing to legislative history rather than the statutory text. Def. Mot. to Dismiss at 12. Given the plain meaning of the statute and Raley's

TUCSRA provides that, "[a] person shall not . . . [k]nowingly procure, attempt to procure, solicit[,] or conspire with another to procure a . . . communication service record of any resident of this state without the authorization of the customer to whom the record pertains or by fraudulent, deceptive or false means." A.R.S. § 44-1376.01. The statute defines "communication service record" to include:

> subscriber information, including name, billing or installation address, length of service, payment method, telephone number, electronic account identification and associated screen names, toll bills or ***access logs***, records of the path of an electronic communication between the point of origin and the point of delivery and the nature of the communication service provided, such as caller identification, automatic number identification, voice mail, electronic mail, paging or other service features.

A.R.S. § 44-1376(1) (emphasis added).

The plain language of the statute demonstrates that TUCSRA applies to Raley's unlawful procurement of Plaintiff's email "access logs." "Absent a statutory definition, courts generally give words their ordinary meaning and may look to dictionary definitions." *In re Drummond*, 543 P.3d 1022, 1025 (Ariz. 2024). "Access" means "to open or load (a computer file, an Internet site, etc.)," and "Log" means "to make a note or record of: enter details of or about in a log." Access, Merriam-Webster, https://www.merriam- webster.com/dictionary/access (last visited September 27, 2024); Log, Merriam-Webster, https://www.merriam-webster.com/dictionary/log (last visited September 27, 2024). By obtaining "record[s] of" and "details" regarding Plaintiff's "open[ing] or load[ing]" of an email, Raley's unlawfully procured Plaintiff's email "access logs."

"Access log" is also a computer science term used to describe a file "that records all events related to . . . user access to a resource on a computer." Arfan Sharif, What Is An Access Log, Crowdstrike (Dec. 21, 2022), https://www.crowdstrike.com/cybersecurity-101/observability/access-logs (last accessed September 27, 2024). An access log allows "[s]oftware developers [and] operation engineers . . . to monitor how their application is

---

failure to identify ambiguities, the Court should decline Raley's invitation to inquire into legislative history. *In re McLauchlan*, 252 Ariz. 324, 326 ¶ 15 (2022) (observing that '[l]egislative history is not a substitute for clear legislative language," and Arizona courts "do not consider such history unless the language is ambiguous").

performing, who is accessing it, and what's happening behind the scenes." *Id.* The information collected by an access log includes the date and time of client access, the client IP address or hostname, and username. *Id.* In the context of email communications, such logs "contain email data on each message that has been sent, including the sender's details, recipient's email address, timestamps, and any error codes. Logs can also link to reports that track marketing metrics like delivery, bounce, and open rates." Compl. ¶ 22, n.5. By prohibiting the unlawful procurement of email "access logs," TUCSRA shields the private email habits of Arizona residents from exploitation by corporations and data brokers.

The "overall statutory context" of the term "access logs" also shows that TUCSRA applies to the email data at issue in this case. First, the statute pares the phrase "access logs" with the phrase "toll bills." A.R.S. § 44-1376(1). "Toll" records refer to records of "incoming and outgoing calls for telephone lines," *United States v. Salgado*, No. 313CR00056LRHVPC, 2018 WL 772079, at *4 (D. Nev. Feb. 7, 2018), including details about when calls are made and for how long.[4] "Access logs" for email accounts provide the same general type of information: records about when and how emails are accessed. Second, the phrase "access logs," in the statute is immediately followed by the phrase "records of the path of an electronic communication." While "access logs" themselves do not provide "records of the path of an electronic communication," they do provide information about when and how an electronic communication is accessed once it reaches its initial destination. TUCSRA thus casts a protective cover over both the *path* of an electronic communication and details regarding when and how an electronic communication is *accessed.*

Further, the text and structure of TUCSRA make clear that the statute prohibits procuring "communication service records" from Arizona residents directly, not just from service providers. When TUCSRA was originally enacted in 2006 to prohibit the unlawful

---

[4] Brad Heath, *U.S. secretly tracked billions of calls for decades*, USA Today, April 8, 2015, available at https://www.usatoday.com/story/news/2015/04/07/dea-bulk-telephone-surveillance-operation/70808616/ ("Toll records are comparable to what appears on a phone bill – the numbers a person dialed, the date and time of the call, its duration and how it was paid for.").

procurement of "telephone records," the Arizona legislature defined the phrase "telephone record" to mean "information that is . . . *retained by* a telephone company." A.R.S. § 44-1376(7)(a) (emphasis added). Importantly, however, when TUCSRA was amended in 2007 to its current form, the legislature defined the phrase "communication service record" more broadly, omitting any requirement that the "communication service record" be "retained by" a service provider. *See* A.R.S. § 44-1376(1) (omitting the "retained by" language). The fact that the legislature chose to include the limiting language "retained by" for "telephone records" but not for "communication service records," "makes it plain that the legislature knew how to add that requirement and intentionally chose not to do so." *Sharpe v. Arizona Health Care Cost Containment Sys.,* 220 Ariz. 488, 496 ¶ 25 (App. 2009); *see also Luchanski v. Congrove*, 193 Ariz. 176, 179 ¶ 14 (App. 1998) ("When the legislature has specifically included a term in some places within a statute and excluded it in other places, courts will not read that term into the sections from which it was excluded.").

A plain reading of TUCSRA supports Plaintiff's allegation in the Complaint: that Raley's "knowingly procure[d] [a] . . . communication service record of any resident of this state without the authorization of the customer to whom the record pertains." A.R.S. § 44-1376.01. Raley's did so by secretly installing email tracking pixels in its marketing emails and extracting Plaintiff's "access logs" and related email data, which revealed details about when and how Plaintiff accessed the marketing emails. Because Raley's did not disclose this practice to Plaintiff, Raley's procured this data "without the authorization" of Plaintiff, and Raley's conduct violates TUCSRA.

Raley's contends that TUCSRA does not apply to its use of email tracking pixels because, in Raley's view, the statute "applies only to records maintained by communication service *providers*—not ordinary retailers or parties to the communications, like Raley's." Def. Mot. to Dismiss at 13 (emphasis in original). Not so. As outlined above, TUCSRA specifically prohibits third-party corporations like Raley's from surreptitiously procuring "communication service records" from Arizona residents. In fact, the Arizona legislature intentionally omitted from TUCSRA the very language Raley's asks this Court to read into the statute—that the law

apply only to records "retained by" a service provider. To be sure, that limitation is present with respect to TUCSRA's separate definition for "telephone records." *See* A.R.S. § 44-1376(7)(a) (defining "telephone records," as "information that is . . . retained by a telephone company"). But when the Arizona legislature amended TUCSRA, it deliberately omitted any requirement that "communication service records" be "retained by" a service provider. Instead, by defining "communication service records" without the "retained by" limitation, the legislature prohibited third parties like Raley's from secretly harvesting such records from Arizona residents directly, as Raley's does routinely and without consent. *See* Def. Not. of Removal, at ¶¶ 19-20 (noting that Raley's sent "one or more emails in the past year that would have included tracking pixels" to over 100,000 Arizona residents). Thus, Raley's request that this Court "construe 'communication service record' as limited to records maintained by a communication service provider," Def. Mot. to Dismiss at 14, runs counter to the plain text of the statute, c*f. Luchanski*, 193 Ariz. at 179 ¶ 14 ("When the legislature has specifically included a term in some places within a statute and excluded it in other places, courts will not read that term into the sections from which it was excluded.").

Raley's also argues that, even if TUCSRA prohibits Raley's from procuring "communication service records" from Arizona residents directly, the type of information harvested by Raley's tracking pixels does not constitute a "communication service record." Def. Mot. to Dismiss at 15. This argument also fails. First, the Complaint alleges that Raley's secretly monitors whether Plaintiff and other Arizona residents "forward" an email, Compl. ¶¶ 8, 21, which means Raley's obtains information about "the path of an electronic communication between the point of origin and the point of delivery." A.R.S. § 44-1376(1) (emphasis added). In other words, when an Arizona resident forwards an email—i.e. the "point of origin"—Raley's tracks "the path of [that] electronic communication" to the forwarding recipient—i.e. the "point of delivery." Thus, anytime an Arizona resident forwards an email containing one of Raley's tracking pixels, Raley's obtains a "communication service record" of that resident without consent.

Second, the Complaint likewise alleges that Raley's procures email "access logs" without the consent of Plaintiff and Arizona residents. Compl. ¶¶ 22, 28, 33, 38, 43-44, 61. TUCSRA's definition of "communication service record" specifically includes "access logs," and, as described above, the plain meaning of that phrase and its statutory context demonstrate that the term includes the detailed log data associated with Plaintiff accessing her emails—including the time, date, manner, and location of access—which is surreptitiously harvested by Raley's tracking pixels. Raley's argues that the phrase "'access logs' refers to the logs of when a consumer used an email *service* (or other communication service), not when they accessed an individual email or interacted with its content." Def. Mot. at 17. But this argument simply recycles Raley's mistaken view that TUCSRA applies only to "communication service records" retained by service providers. As explained above, the Arizona legislature deliberately defined "communication service record," in a manner that prohibits third parties like Raley's from secretly extracting "communication service records" such as email "access logs" from Arizona residents directly. Raley's cabined and self-serving interpretation of TUCSRA should be rejected.

## CONCLUSION

Because Raley's improperly removed this case and then abandoned its burden to demonstrate subject matter jurisdiction, the Court should remand this case to state court and award Plaintiff's attorneys' fees. If the Court reaches the merits of Raley's 12(b)(6) motion to dismiss, the Court should deny that motion because Plaintiff alleges a viable violation of TUCSRA based on Raley's surreptitious harvesting of Plaintiff's email "access logs" and related data through its non-consensual deployment of email tracking pixels.

Respectfully submitted,

ZIMMERMAN REED LLP

Date: October 7, 2024 By: *s/Ryan Ellersick*

Hart L. Robinovitch (AZ #020910)
Ryan J. Ellersick (AZ #038805)
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400

hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

*Attorneys for Plaintiff*